**In re TALLAHASSEE ASSOCIATES, L.P., Debtor.**

**Bankruptcy No. 90–2800–BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 15, 1991.

Lori R. Beers, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Debtor.

William H. Schorling, James D. Newell, Klett Lieber Rooney & Schorling, Pittsburgh, Pa., for Project Finance Corp.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Project Finance Corporation ("PFC") has voted against debtor's proposed Third Amended Plan of Reorganization ("Plan"). Debtor seeks to have its Plan confirmed by having it "crammed down" pursuant to 11 U.S.C. § 1129(b).

Debtor's attempt at a "cram down" will be rejected. Its Plan will not be confirmed for reasons set forth below.

–I–

### BACKGROUND

Debtor, a limited partnership organized and existing under the law of the Commonwealth of Pennsylvania, filed a voluntary chapter 11 petition on September 10, 1990. Its major asset is an office building located in Tallahassee, Florida, known as the City Centre Building ("building"), which it has continued to operate pursuant to 11 U.S.C. §§ 1107 and 1108.

The building was subject to three mortgages as of the filing of the bankruptcy petition. The first mortgage is held by Standard Federal Savings Bank ("Standard Federal") and secures an obligation in the amount of $8,110,927.00. As a result of debtor's default, interest has accrued leaving a debt of $9.2 million. The second mortgage held by GTMAC has recently been acquired by an affiliate of debtor. It secures an obligation in the amount of $348,623.00. The third mortgage is a pur-

**714**

chase money wrap-around mortgage held by PFC which secures an obligation in the amount of $4,094,635.00.

Debtor submitted its Third Amended Plan on July 16, 1991.

Class I contains Administrative and Priority Claims, including generally the professionals and wage claimants acting on behalf of the estate.

The secured claims are divided into three classes, all of which are impaired. Class 2A consists of Standard Federal, the first mortgagee. Class 2B consists of GTMAC, the second mortgagee. Class 2C consists of PFC, the third mortgagee.

Class 3 consists of general unsecured creditors "as well as any deficiency claims arising where a secured creditor's interest in debtor's property exceeds the value of such property in whole or in part". PFC is the sole member of Class 3.

The partnership interests are divided into two classes. Class 4A consists of the limited partners of debtor. Class 4B consists of the general partners.

The Plan provides that the amount due and owing to Class 2A—i.e., to Standard Federal—is $8,200,000.00 plus interest. Monthly payments shall be made to Standard Federal at the rate of ten percent (10%) *per annum*. Should the subject property generate cash flow in excess of the amounts required for normal operating expenses and for payment of debt service, the amount of such excess shall be applied to reduce the first mortgage. Standard Federal is to retain its first lien on the building. Finally, Standard Federal may agree to modification of its treatment, should debtor be unable to maintain adequate cash flow.

The claim of Class 2B, which is owned by an affiliate of debtor, is to be subordinated to the claim of Class 3. Payment will not be made to Class 2B until Class 3 has received distribution.

Class 2C is to receive distribution in cash equal to the value of its allowed secured claim, if any, on the date of Plan confirmation. The Plan proponent avers that Class 2C (PFC) has no secured claim and, accord-

ingly, it is not contemplated that PFC will receive any distribution on the date of confirmation.

The Plan further provides that Class 3 is to receive a new mortgage providing for payment of the lesser of $100,000.00 in cash or of any net proceeds from the sale of the building after payment to Classes 2B and 2C and payment of post-confirmation operating expenses. Interest on the new mortgage shall not begin to accrue until October 1, 1997. No payment of any kind on the new third mortgage shall be made until the claim of Class 2A (approximately $9.2 million) has been paid in full.

The members of Class 4A—i.e., the limited partners—are required to make cash contributions pursuant to cash calls by debtor. The limited partners will be required to contribute a sum not to exceed $300,000.00 in order to retain their limited partnership interests. Those limited partners who do not contribute shall retain no interest in the reorganized partnership. Their interest shall be allocated on a *pro rata* basis to contributing limited partners.

The interest of Class 4B—i.e., the general partner—shall dissolve upon confirmation. A new general partner shall be chosen by those members of Class 4A who make the required cash contribution.

Paragraph 4.01 pertains to funding of the Plan. Funding will be obtained through the cash call to the limited partners. The "bulk" of those funds are to be used to pay for structural repairs to the building. It further states that debtor intends to modify the terms of the loan from Standard Federal and intends to refinance the obligation. In the event that it is unable to obtain refinancing, debtor intends to further modify the term of the obligation to Standard Federal by extending its term through October 1, 1997.

A hearing on confirmation of debtor's Plan was held on September 6, 1991, wherein debtor informed the court that the following classes voted to accept the Plan:

— Class 2A (first mortgagee Standard Federal—to be paid in full with interest);

— Class 2B (second mortgagee owned by debtor's affiliate); and

— Class 4A (the limited partners that answered the cash call—will retain ownership of the estate asset).

The following classes rejected the Plan:

— Class 2C (third mortgagee PFC—contemplated zero distribution under the Plan);

— Class 3 (unsecured creditor PFC—although the Plan may indicate to the contrary, counsel to the Plan proponent advised the court that a zero distribution is contemplated under the Plan); and

— Class 4B (General Partner—interest to dissolve upon Plan confirmation) did not cast a ballot.

Class 4B is deemed not to have accepted the Plan. *See* 11 U.S.C. § 1126(g).

Pursuant to paragraph 3.09 of the Plan, debtor thereupon moved for confirmation of the Plan according to 11 U.S.C. § 1129(b), notwithstanding the objection of PFC.

## –II–

### ANALYSIS

PFC has raised several objections to confirmation of debtor Plan. Its first objection states that the Plan cannot be confirmed because it violates the "absolute priority rule" by permitting the limited partners to retain an interest in the reorganized debtor.

11 U.S.C. § 1129(a) sets forth the various requirements that must be met before a plan can be confirmed by the court. One of these requirements is that each class of claims either must accept the Plan or not be impaired under the Plan. 11 U.S.C. § 1129(a)(8). Classes 2C and 3 are impaired and have voted to reject the Plan. Consequently, 11 U.S.C. § 1129(a)(8) has not been satisfied.

Failure of a plan to meet the requirements of 11 U.S.C. § 1129(a)(8) is not necessarily fatal to its confirmation. Section 1129(a)(8) may be circumvented if the requirements set forth at 11 U.S.C. § 1129(b),

the so-called "cram-down" provision, are met.

Section 1129(b)(1) provides that if all the requirements of section 1129(a) other than subsection (8) have been met the court shall, on request of the proponent of the plan, confirm the plan, provided that it does not discriminate unfairly and is "fair and equitable" with respect to the impaired class that voted to reject it. If the impaired class is unsecured, the requirement that the treatment accorded them be "fair and equitable" includes the following:

(i) each member of that class must receive or retain property, as of the effective date of the plan, that is equal to the amount of its allowed claim; or

(ii) the holder of any claim in a junior class must not receive or retain any property on account of its claim.

11 U.S.C. § 1129(b)(2)(B).

Neither of these conditions has been met in this case. Debtor's Plan will not pay Class 3—i.e., PFC—the full value of its allowed claim. In fact, counsel to the Plan proponent advises the court that as PFC voted against the Plan it will receive no distribution in either its secured classification or its unsecured classification under the Plan. In addition, the Plan provides that those limited partners of debtor who elect to make a capital contribution will retain their equity interest in the reorganized debtor.

### A. *The "New Value Exception" To The Absolute Priority Rule.*

■ Debtor, while conceding that its Plan does not comply with the above requirements, nonetheless insists that its failure to do so is not necessarily fatal to Plan confirmation. According to debtor, its Plan may be confirmed under the "new value exception" to the absolute priority rule as codified at 11 U.S.C. § 1129(b)(2)(B). PFC argues that the "new value exception" to the absolute priority rule has not retained its vitality under the Bankruptcy Code. Resolution of this question requires analysis of this historical antecedent of the absolute priority rule and the "exception" thereto.

The absolute priority rule had its origins in the equity jurisdiction of the court. *See* Peeples, *Staying In: Chapter 11, Close Corporations and The Absolute Priority Rule*, 63 Am.Bankr.L.J. 65.73 (1989). The requirement that a plan be "fair and equitable" was first promulgated by the Supreme Court in cases dating back some ninety (90) years in which questions arose concerning the precedence to be accorded to creditors over shareholders in reorganization cases. *See Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899); *Northern Pacific Ry Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Kansas City Terminal Ry Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926).

The Supreme Court, in *Louisville Trust Co.*, reaffirmed the following principle, which eventually became known as the absolute priority rule:

> The stockholders' interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors.... [A]ny arrangement of the parties by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.

*Louisville Trust Co.*, 174 U.S. at 684, 19 S.Ct. at 830. The Supreme Court also reaffirmed this "fixed principle" in *Kansas City Terminal Ry. Co.*, where it asserted that "to the extent of their debt creditors are entitled to priority over stockholders against all the property of an insolvent corporation". 271 U.S. at 455, 46 S.Ct. at 551.

These same cases, however, also held that an "exception" to the absolute priority rule might be necessary at times to ensure sufficient funds to facilitate successful reorganization:

> Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases, the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.

*Kansas City Terminal Ry. Co.*, 271 U.S. at 454–55, 46 S.Ct. at 551–552.

Eventually, this court-created "fixed principle" was codified into law and was incorporated into section 77B of the former Bankruptcy Act, where the requirement that a plan be "fair and equitable", a term of art for the absolute priority rule, was included. *See Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 118–19, 60 S.Ct. 1, 9, 84 L.Ed. 110 (1939).

*Case* affirmed, in *dicta*, the continued vitality of the above "exception" to the absolute priority rule even after enactment of Section 77B:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... Especially in [*Kansas City Terminal Ry. Co.*] did the court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. When that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to the contribution, no objection can be made.

*Case*, 308 U.S. at 121, 60 S.Ct. at 10.

Section 77B of the former Bankruptcy Act has been replaced by section 1129(b) of the Bankruptcy Code. The Supreme Court has not been required to decide whether the exception to the absolute priority rule acknowledged in *Case* retains its vitality under the Bankruptcy Code.

The only case in which the Supreme Court has been called upon to interpret section 1129(b) is *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Its decision did not, however, depend on whether the "new value exception" to the absolute priority rule was still viable. The court declined the invitation to base its decision on such a determination when it said:

> Thus, our decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* ex-

ception—a question which has divided the lower courts since passage of the Code in 1978.... Rather, we simply conclude that even if an "infusion-of-money-or-money's-worth" exception to the absolute priority rule has survived the enactment of § 1129(b), respondent's proposed contribution to the reorganization plan is inadequate to gain the benefit of this exception.

*Ahlers,* 485 U.S. at 203–04 n. 3, 108 S.Ct. at 966–67 n. 3, 99 L.Ed.2d at 177.

The United States Court of Appeals for the Third Circuit has not been called upon to decide whether the "new value exception" to the absolute priority rule also applies to 11 U.S.C. § 1129(b).

Those courts that have decided this issue are split. A majority of the cases hold that the "new value exception" retains its vitality. *See In re E.I. Parks No. 1, Ltd. Partnership,* 122 B.R. 549, 554 (Bankr. W.D.Ark.1990); *In re Mortgage Investment Co. of El Paso,* 111 B.R. 604, 617–18 (Bankr.W.D.Tex.1990); *In re 222 Liberty Associates,* 108 B.R. 971, 983–85 (Bankr. E.D.Pa.1990); *In re Pullman Construction Industries, Inc.,* 107 B.R. 909, 945 (Bankr.N.D.Ill.1989); *In re Greystone III Joint Venture,* 102 B.R. 560, 572 (Bankr. W.D.Tex.1989); *Matter of Yasparro,* 100 B.R. 91, 96 (Bankr.M.D.Fla.1989); *In re Future Energy Corp.,* 83 B.R. 470, 497 (Bankr.S.D.Ohio 1988).

Other cases have, however, held that the exception does not apply under the Bankruptcy Code. *See In re Outlook/Century Ltd.,* 127 B.R. 650, 656 (Bankr.N.D.Cal. 1991); *In re Drimmel; In re Unrub,* 108 B.R. 284, 288 (Bankr.D.Kan.1989); *In re Lumber Exchange Limited Partnership,* 125 B.R. 1000, 1007 (Bankr.D.Minn.1991); *In re Winters,* 99 B.R. 658, 663 (Bankr. W.D.Pa.1989).

Although plausible arguments exists on both sides of this question, the better-reasoned position is that the "new value exception" to the absolute priority rule retains its vitality under the Bankruptcy Code.

To begin with, careful reading of the Supreme Court's opinion in *Ahlers* suggests that it does *not,* even implicitly, cast doubt upon the continued vitality of the "new value exception". The Supreme

Court *refused* to decide whether codification of the absolute priority rule eliminated the new value exception mentioned in *Ahlers,* 485 U.S. at 203, n. 3, 108 S.Ct. at 966–67 n. 3. Moreover, there is nothing in the analysis utilized by the Court in arriving at its decision which would indicate, even by inference, that the Court was of the opinion that the "new value exception" no longer applied.

■ Also, there is nothing in the legislative history of the 1978 Code which suggests that Congress intended to eliminate the "new value exception" when it enacted section 1129(b). Congress is presumed to act with knowledge of the judicial gloss given to statutory provision and thus adopts that gloss unless it affirmatively acts to change it. *See Fla. National Guard v. Federal Labor Relations Authority,* 699 F.2d 1082, 1087 (11th Cir.), *cert. denied, Federal Labor Relations Authority v. Fla. National Guard and Dept. of Defense,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). It makes little sense to think that Congress would have enacted the absolute priority rule into law without giving some indication that the "new value exception" to it was being rejected.

Finally, as has been noted, the "new value exception" was created by courts in response to the recognition that inflexible application of the absolute priority rule would, in many instances, subvert the very process of reorganization which the rule was intended to promote. Specifically, it was recognized that an infusion of new capital may be required in order for successful reorganization to take place. There is nothing about the structure of the Code or about reorganization in today's business climate that alters this recognition:

> The same equitable considerations that motivated the recognition of the "exception" in *Kansas City Terminal* and that reaffirmed its vitality under Section 77B in *Case* commend its preservation under the Bankruptcy Code, to assure that an over-strict application of the "fair and equitable" standard does not strangle the debtor and leave the reorganization stillborn.

*In re Greystone III Joint Venture*, 102 B.R. at 575.

### B.) *The Requirements Of The "New Value Exception".*

Debtor insists that the treatment of PFC under the proposed plan satisfies the requirements of the "new value exception". PFC denies that those conditions have been met.

■ In order for the "new value exception" to apply and for debtor's plan to be confirmed, the proposed cash infusion by the limited partners must be: (1) necessary for an effective reorganization; and (2) reasonably equivalent in value to the interest in the reorganized debtor that is to be retained by the contributing limited partners. *See Case*, 308 U.S. at 121, 60 S.Ct. at 10; *also In re Greystone III Joint Venture*, 102 B.R. at 573.

■ A "rigorous showing" as to these requirements is necessary in order to ensure that a debtor's equity holders do not eviscerate the absolute priority rule by means of a contrived infusion. *See In re Greystone III Joint Venture*, 102 B.R. at 573. The burden is upon the proponent of the plan to demonstrate, by clear and convincing evidence, that the requirements for a "cram down" have been met. *See In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr.N.D.Ill.1990).

■ Debtor has failed to establish, by even a preponderance of the evidence, that the proposed capital infusion is necessary for an effective reorganization.

Testimony was offered by debtor that, as of July 31, 1991, its monthly net cash flow was $60,000 and that the monthly payment required to service the debt owed to Standard Federal is approximately $77,000. According to debtor, the proposed capital infusion is necessary in order to secure the cooperation of Standard Federal with respect to the treatment it is to receive under the Plan. In return for the proposed capital infusion by the limited partners, Standard Federal allegedly has agreed to accept a cash flow mortgage which will enable debtor to remain a viable entity.

Debtor's contention that the capital infusion is necessary is fatally flawed in several respects.

To begin with, the contention that the capital infusion by the limited partners is a *quid pro quo* for Standard Federal's acceptance of the Plan is unfounded. No credible evidence was presented at hearing that Standard Federal's acceptance, which unquestionably is indispensable to an effective reorganization, was contingent upon such a capital infusion. The Plan proponent merely supplied this indispensable fact by way of post-trial brief.

The contention that the proposed capital infusion is necessary is flawed in an even more fundamental respect: debtor's contention that its cash flow will be inadequate to enable it to service the debt owed to Standard Federal is contradicted by credible evidence.

Debtor's anticipated monthly cash flow in all likelihood will be sufficient to service the debt owed to Standard Federal, *without* the need for an infusion of new capital. Its cash flow for the first six (6) months of 1991 averaged approximately $77,000 per month. $77,000 per month is adequate to service the Standard Federal debt. The present monthly cash flow of only $60,000 is a temporary aberration caused by the loss of a tenant in the building in July of 1991. The property manager for the building testified that debtor is actively seeking another tenant to occupy the vacant space and anticipates that one will be found by January of 1992. When this happens, debtor's monthly cash flow once again should be adequate to service the debt owed to Standard Federal. It is expected that the rental paid by a new tenant will equal or exceed the rental paid by the prior tenant and that the lease will be for a relatively long duration.

Even if it be assumed that debtor is correct in asserting that there will be a shortfall of approximately $17,000 per month in debtor's cash flow and that it will be unable to service the debt owed Standard Federal from rental revenues, the proposed cash infusion by the limited partners still is not necessary to an *effective* reorga-

nization. Specifically, the funds to be contributed will be insignificant in relation to the total capital required to compensate for the shortfall in the cash flow.

Paragraph 4.03 of the proposed Plan specifies that the Plan is to be funded through a cash call to the limited partners to raise approximately $300,000. It further provides that "[t]he bulk of the funds necessary ... will be used to pay for structural repairs which are essential to maintain the integrity of the structure of the building and the value of the collateral securing the claims of Class 2A".

Structural repairs to the building costing approximately $260,000 already have been made. Debtor's own witnesses testified that additional repairs costing at least $750,000 remain to be made. Assuming that the "bulk" of the capital contribution by the limited partners goes towards these additional repairs, little (if anything) will remain to compensate for the alleged shortfall of some $17,000 per month. By debtor's own calculation, the annual shortfall amounts to $204,000 (12 × $17,000 = $204,-000). The remainder of the capital contribution, after the "bulk" of it has been used to pay for additional structural repairs, will be woefully inadequate to enable debtor to make up the shortfall and, as a consequence, to *effectively* reorganize.

Also, debtor's contention that the proposed capital infusion of $300,000 is necessary is belied by the fact that only $228,-000, or approximately seventy-five percent (75%) of that amount, has been contributed by the limited partners. In spite of the fact that this amount is considerably less than what is called for in the Plan, debtor has indicated its determination to proceed with reorganization. The fact that debtor is willing to proceed with less than the amount prescribed in the Plan intimates that the proposed capital infusion is not really necessary but, rather, is merely a pretext by which the limited partners seek to retain their interest in debtor. One suspects that if an even smaller amount had been contributed debtor would nonetheless be eager to attempt to reorganize. For a few pennies on the dollar, none of which will be received by the creditor, this reorganization relieves debtor of PFC's claim.

The above result, standing alone, mandates that debtor's attempt at a "cram down" must fail. That is not the end of the matter, however. It is also the case that the value of the interest in the reorganized partners is not reasonably equivalent to the value of their contribution. To the contrary, the value of what they will receive in return—i.e., their interest in the reorganized debtor—far exceeds the value of their contribution.

According to debtor, the value of the interest to be retained by the contributing limited partners does not exceed the value of their capital contribution. In support of its position, debtor proffers two arguments. Debtor first argues that the value of the interest to be retained is *less than zero* because the debt owed to Standard Federal exceeds the value of the building. The second argument is stated in the alternative. Even if the value of debtor's estate is greater than the debt owed to Standard Federal, the value of the interest to be retained by the contributing limited partners nonetheless is *zero* because the cash flow generated from rentals will be insufficient to amortize the debt at a rate that would generate positive equity.

Both of these arguments are unsound for basically the same reason.

The total value, at the present time, of debtor's estate is approximately $8,700,000. The building has a value of approximately $8,000,000, and debtor also has the following assets totalling $692,080 as of June 30, 1991:

| | |
|---|---|
| Cash | $ 37,641.00 |
| Cash in Standard Federal Escrow | 434,405.00 |
| Accounts Receivable | 143,493.00 |
| Notes Received and Accrued Interest | 76,541.00 |
| Total: | $692,080.00 |

The amount of the debt owed to Standard Federal is approximately $9,200,000.

In spite of this "negative equity" of approximately $500,000 *at the present time,* the value of the interest to be retained is not commensurate with the value of the limited partners' capital contribution. It

previously had been determined that the cash flow generated from rentals in all probability will be sufficient, in both the near- and long-term future, to service and amortize the debt owed to Standard Federal. As a result, the amount due and owing on that debt will be reduced accordingly every month. In a relatively short period of time, a year or two at most, the debt owed to Standard Federal will be reduced to the point where the "negative equity" will be eliminated and a "positive equity" will exist. In due course, the debt to Standard Federal would be retired and the building no longer would be subject to a mortgage. In other words, that "positive equity" will only increase over time.

Section 1129(b) requires that the treatment accorded a dissenting class of creditors be "fair and equitable" in order for a "cram down" to succeed. The situation just described is anything but fair and equitable to PFC. It is inappropriate and unconscionable that the contributing limited partners retain their interest in the reorganized debtor at the expense of a senior class of creditors when the value of the interest they retain can be expected to increase over time, regardless of whether they infuse new capital into the debtor. The unfairness and inequitability of the proposed treatment of PFC is exacerbated by the fact that *none* of the infused capital would go to satisfy creditors, in particular PFC. The new capital primarily (if not entirely) is to be used to make structural repairs to the building, and thereby to preserve (and possibly enhance) the value of the interest to be retained by the contributing limited partners.

As previously indicated, the participation of the limited partners is not necessary for an effective reorganization. The inescapable conclusion is that the Plan proposed by debtor is merely an artifice designed to enable the limited partners to retain their interest by contributing unneeded capital at the expense of PFC. The sole beneficiaries of such an artifice are Standard Federal and the limited partners, who at the end of this process will be the proud owners of an $8.2 million estate.

Debtor's quest to have its Third Amended Plan of Reorganization confirmed by having it "crammed down" over the objection of PFC must be rejected.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW at Pittsburgh this 15th day of October, 1991, for reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that debtor's Third Amended Plan of Reorganization is *not* confirmed. The objection of Project Finance Corporation to said Plan is sustained.