BT/SAP POOL C ASSOCIATES, L.P., Appellant,

v.

COLTEX LOOP CENTRAL THREE PARTNERS, L.P., Appellee.

No. 96 Civ. 0029 (DC).

United States District Court, S.D. New York.

Nov. 19, 1996.

As Amended Nov. 21, 1996.

---

Luskin & Stern by Michael Luskin, Lori Lapin Jones, New York City, for Appellant.

Pryor, Cashman, Sherman & Flynn by Peter D. Wolfson, Suzanne D.T. Lovett, New York City, for Appellee.

## AMENDED OPINION

CHIN, District Judge.

At issue in this appeal from a final order of the Bankruptcy Court (Cornelius Blackshear, B.J.) confirming a Chapter 11 plan of reorganization is the interplay between the "absolute priority rule" and what has been referred to generally as the "new value exception."

The absolute priority rule was first developed as a matter of common law in the nineteenth century. It provides that equity holders (or other junior creditors) may not receive or retain any property or interest in a debtor under a plan of reorganization unless objecting senior creditors are paid in full first.

Over the years a corollary to the absolute priority rule developed, which became known as the new value exception: as a last resort to liquidation, equity holders could retain an interest in the debtor, even though objecting senior creditors were not paid in full, as long as the equity holders contributed "new value" to the reorganization effort.

In 1978, the absolute priority rule was codified as § 1129 of the Bankruptcy Code. No specific reference was made in the Code, however, to the new value exception. Consequently, the courts were confronted with the issue of whether the new value exception survived codification of the absolute priority rule.

In the present case, appellant BT/SAP Pool C Associates, L.P. ("BT/SAP") challenges the Bankruptcy Court's approval of a plan (the "Plan") proposed by the appellee/debtor, Coltex Loop Central Three Partners, L.P. ("Coltex"). Among other things, BT/SAP contends that because the new value exception did not survive codification of the absolute priority rule, the Bankruptcy Court erred in applying the new value exception. Alternatively, BT/SAP contends that even assuming the new value exception did survive, the Bankruptcy Court erred in concluding that its requirements had been met in this case.

I hold that the Plan does not meet the requirements of § 1129 of the Code. Al-though I agree that the "new value exception" survives in some form, § 1129 clearly prohibits equity from receiving or retaining any property "on account of" its interest unless senior creditors are paid in full. In other words, although equity may contribute new value in order to retain its interest, it may not gain an advantage over creditors and others by virtue of its equity interest.

Here, Coltex's limited partners did have an advantage over others: they had the exclusive right to bid on the Property, a right that they had by virtue of—or "on account of"—their equity interest. Indeed, the testimony of one of the limited partners showed unequivocally that Coltex did not make reasonable efforts to bring in new equity or to obtain other financing. Instead, the testimony showed that Coltex's limited partners were "lenders of first opportunity" rather than "lenders of last resort."

These circumstances have produced a distinctly unfair and inequitable result. Under the Plan, Coltex's limited partners would retain their full equity interest in Coltex; Coltex would retain ownership of the real property (the "Property") in which BT/SAP had a security interest; and Coltex would be absolved of some $7.6 million in debt in return for their contribution to the reorganization efforts of only $3.4 million. On the other hand, BT/SAP, Coltex's overwhelmingly largest creditor, would be paid only half of the $7.2 million that it is owed at the same time that its security interest in the Property would be extinguished. Although the Bankruptcy Court valued the Property at only $2.95 million, the Property was never exposed to the market and no one other than Coltex's limited partners were permitted to bid.

Accordingly, the decision of the Bankruptcy Court confirming the Plan is reversed and confirmation of the Plan is denied.

## BACKGROUND

### A. Facts

Coltex, a limited partnership consisting of one general partner and six limited partners (the "Partners"), was organized under the laws of the state of Delaware in 1990. Coltex's primary asset is the Property, a ten-

story office building in Houston, Texas. (Op. at ¶ 1).[1] Coltex purchased the Property in June 1990 for $8,500,000. Coltex financed approximately $6,300,000 of the purchase price with funds obtained from a secured loan. (Op. at ¶ 5).

In 1994, the loan was assigned to BT/SAP as part of a portfolio purchase by BT/SAP from the Bank of Boston. At the time of the assignment to BT/SAP, Coltex was in default under the loan. On January 6, 1995, BT/SAP notified Coltex that it was in continued default under the loan agreements and that if it did not cure the default, the Property would be posted for foreclosure on February 7, 1995. On February 6, 1995, Coltex paid $25,000 to BT/SAP in exchange for which BT/SAP agreed to adjourn the upcoming foreclosure sale for a period of one month. On February 9, 1995, BT/SAP notified Coltex that the sale would occur on March 7, 1995. (Op. at ¶¶ 12–13).

### B. *The Filing of the Petition*

On March 7, 1995, just prior to the foreclosure sale, Coltex filed a Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York. The foreclosure sale was automatically stayed. After an initial dispute as to the amount due on the loan, BT/SAP and Coltex stipulated that BT/SAP's total claim was $7,200,000. Coltex's schedule also listed other general unsecured claims of approximately $123,000 and various tax claims of approximately $355,000. (Op. at ¶ 14).

### C. *The Plan*

In September 1995, Coltex submitted its Third Amended Plan of Reorganization (the "Plan"). The Plan contained the following classes and proposed the following treatment:

*Class 1 Tax Claims*—Cash payment of essentially the full amount of the claims.

*Class 2 BT/SAP Secured Claim*—Option on the part of Coltex to pay the claim either in cash on the effective date or over time.

*Class 3 Unsecured Claims*—(including BT/SAP's unsecured deficiency claim)— To be paid 10% in cash.

*Class 4 Equity Interests of Partners*—To be retained.

(J.D. at 112).

The Plan permitted the Partners to contribute money to Coltex and, in return, retain their interests in Coltex post-confirmation. At trial, Joseph Lambert ("Lambert"), a limited partner and vice president of the general partner of Coltex, testified that the Partners, *i.e.*, the equity holders, would be funding the amount necessary to pay the allowed claims under the Plan, which totalled approximately $3.4 million. (Tr. at 1711).[2] Lambert further testified that Coltex had approached only one lender in the last year in an effort to obtain equity or other financing for the Property and that the request was rejected. (Tr. at 1744–45). Lambert also stated that within the prior year Coltex had not retained any mortgage brokers or outside consultants to help locate other sources of equity or financing. (Tr. at 1746). In fact, Lambert admitted that the Partners never even considered bringing in new equity partners as an alternative means of obtaining money to fund the Plan. (Tr. at 1744–45).

BT/SAP objected to the Plan on the grounds, *inter alia*, that (1) the Bankruptcy Court incorrectly valued the Property at $2.95 million (BT/SAP's appraisals valued the Property at $5.7 million); (2) the tax claims were artificially impaired so as to create an impaired class allowing Coltex to achieve a "cramdown" of the Plan over BT/SAP's objections; and (3) the Plan violated the requirements of the "absolute priority rule."

### D. *The Bankruptcy Court's Decision*

On May 21, 1996, the Bankruptcy Court issued its "Order Confirming Debtor's Third Amended Plan of Reorganization Dated Sep-

---

1. References to the Bankruptcy Court's June 20, 1996, Findings of Fact and Conclusions of Law, as amended on June 21, 1996, are cited as "Op. at ___." (*See* Joint Designation of Record on Appeal ("J.D.") at 117, 118).

2. References to the transcripts of the confirmation hearing are cited as "Tr. at ___."

tember 13, 1995" over the objections of BT/SAP. (J.D. at 112). On June 20, 1996, the Bankruptcy Court issued findings of fact and conclusions of law, which were amended on June 21, 1996. (J.D. at 117, 118). The Bankruptcy Court set the value of the Property at $2.95 million and held that consequently "the capital infusion by the [Partners] satisfies 11 U.S.C. § 1129(b) and the 'new value' exception to the 'absolute priority rule.'" (J.D. at 118, ¶ 23). Hence, the Bankruptcy Court confirmed the Plan.

This appeal followed.

### DISCUSSION

BT/SAP contends that the Plan violates the absolute priority rule because it permits the Partners to retain their equity interest without providing for full payment of BT/SAP's senior claim. BT/SAP also argues that the new value exception did not survive the codification of the absolute priority rule and that, therefore, Coltex's reliance on that exception is unavailing. BT/SAP also argues that, even assuming the new value exception survives, its requirements were not met in this case. BT/SAP has raised a number of other arguments as well, but in view of my decision below, I need not reach them.

### A. *Standard of Appellate Review*

A district court must accept the findings of fact of a bankruptcy court unless the party contesting the findings of fact carries the burden of establishing that the findings are clearly erroneous and that no reasonable person could agree with them. Fed. R.Bank.P. 8013; *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) ("We will reverse the bankruptcy court only if we are 'left with the definite and firm conviction that a mistake has been committed.'") (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)). The district court, however, may review conclusions of law de novo. *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 988 (2d Cir.1990), *cert. denied*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

### B. *Pre–Code Bankruptcy Law*

Pre–Code bankruptcy practice was governed by the Bankruptcy Act of 1898 (the "Act"). *See* Act of July 1, 1898, Pub.L. No. 55–171, 30 Stat. 544 (1898) (repealed 1979). The Act required plans of reorganization to be "fair and equitable," *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988), but did not define that phrase. As a result, the meaning of the phrase "fair and equitable" was left largely to judicial construction and its boundaries became defined by judge-made rules. One of those rules was the "absolute priority rule."

#### 1. *The Absolute Priority Rule*

The absolute priority rule was developed by the Supreme Court in the late 1800's in response to problems encountered in railroad receivership actions. Michael H. Strub, Jr., *Competition, Bargaining, and Exclusivity Under the New Value Rule: Applying the Single Asset Paradigm of Bonner Mall*, 111 Banking L.J. 228, 235 (1994); *see Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1360 (7th Cir.1990). In these cases managers of the railroads would often "cut a deal" whereby partial payments were made on certain senior creditors' claims and the shareholders—who sometimes included these same managers—would retain their interests in the railroad provided they contributed some additional capital. Strub, 111 Banking L.J. at 235; *Kham & Nate's Shoes,* 908 F.2d at 1360. In this way, senior creditors were able to conspire with shareholders to sell the bankrupt railroad back to the shareholders while wiping out the claims of junior creditors. Strub, 111 Banking L.J. at 235; *Kham & Nate's Shoes,* 908 F.2d at 1360.

To prevent this inequity and to protect junior creditors, the Supreme Court held that the shareholders of a debtor could not, under any circumstances, retain an interest in the debtor's property unless all creditors' claims were paid in full. *See* Strub, 111 Banking L.J. at 238–39. This rule, which became known as the absolute priority rule, was based on contract law. *Kham & Nate's Shoes,* 908 F.2d at 1360. Because contracts gave creditors priority over shareholders, the

Court required a plan of reorganization to do the same. *Northern Pacific Ry. v. Boyd,* 228 U.S. 482, 504–05, 33 S.Ct. 554, 560–61, 57 L.Ed. 931 (1913). The Court, therefore, perceived the absolute priority rule as barring the retention of any interest by a shareholder if any layer of creditor did not receive full payment under a plan. *Id.* In other words, creditors had absolute priority over equity holders.

The Court, however, soon realized that its rule provided harsh and unwanted results in certain cases. The absolute priority rule was meant to only bar a "new value" plan when that plan was arrived at through collusion and over the dissent of junior creditors. *See* Strub, 111 Banking L.J. at 238–39. The rule, however, also barred the confirmation of "new value" plans where creditors consented to old equity's participation because that was, in fact, the best option available for all parties concerned. *Id.* The rule, therefore, could at times work to the disadvantage of the very same junior creditors it was meant to protect. *Id.* This dilemma led to the creation of what has become known as the "new value exception."

### 2. *New Value Exception*

The new value exception dates almost as far back as the absolute priority rule itself. *In re Matter of Snyder,* 967 F.2d 1126, 1128 (7th Cir.1992). In *Northern Pacific Railway Co. v. Boyd,* the Court noted in dicta that as a last resort to liquidation, old equity could contribute funds and retain control of the debtor so long as creditors were given this opportunity first and declined to do so. 228 U.S. 482, 508, 33 S.Ct. 554, 561–62, 57 L.Ed. 931 (1913); *see also Kansas City Terminal Ry. v. Central Union Trust Co.,* 271 U.S. 445, 455, 46 S.Ct. 549, 551–52, 70 L.Ed. 1028 (1926) (stating that in the course of reorganization new funding may become necessary and it may be impossible to obtain those funds from any source other than old equity holders). The Court reaffirmed this principle in *Case v. Los Angeles Lumber Prods. Co.,* finding that there are times when "stockholders may participate in a plan of reorganization of an insolvent debtor." 308

U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939).

These statements were embraced by numerous courts and the concept became known as the new value "exception." To satisfy the new value exception, a contribution had to be necessary to the success of the undertaking and old equity's participation had to be based on a substantial contribution in money or money's worth. *Los Angeles Lumber,* 308 U.S. at 121–22, 60 S.Ct. at 10–11. In addition, the contribution had to be reasonably equivalent to the property received or retained by the equity holder. *Id.*

### C. *The Code*

#### 1. *Codification of the Absolute Priority Rule*

In 1978, the requirement that a bankruptcy plan be "fair and equitable" gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 1129 (1988 ed. & Supp. V) (hereinafter "§ 1129"). The definition of "fair and equitable" is now no longer a matter of the common law but is instead expressly set forth in § 1129. Likewise, the absolute priority rule was expressly incorporated into the Bankruptcy Code. The rule, as codified, states that unless a class of creditors is paid in full on their claims then the "holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." § 1129(b)(2)(B)(ii).

#### 2. *New Value Under the Code*

Although Congress chose to codify the absolute priority rule, it did *not* explicitly codify the new value exception. That decision, and its implications, has been the subject of great debate and courts have been confronted with the question of whether the new value "exception" remains viable under the Code. Neither the Supreme Court nor the Second Circuit has addressed the continuing viability of the exception. Two bankruptcy judges in this district have decided the issue, holding that the new value exception survived the codification of the absolute priority rule. *In*

*re Fur Creations By Varriale, Ltd.*, 188 B.R. 754 (Bankr.S.D.N.Y.1995); *In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695 (Bankr.S.D.N.Y.1993). Circuit and district courts across the country have split as to whether the new value exception survived and no clear line of authority or reasoning has emerged. *Compare Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Properties XVIII )*, 961 F.2d 496 (4th Cir.) (reviewing split in cases but and holding that "even if some limited new capital exception were viable" under the Code it did not apply on facts of case), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990) (questioning vitality of new value exception); *In re Drimmel*, 135 B.R. 410 (D.Kan.1991) (finding that new value exception no longer exists), *aff'd sub nom. Unruh v. Rushville State Bank*, 987 F.2d 1506 (10th Cir.1993); *Piedmont Assocs. v. Cigna Prop. & Cas. Ins. Co.*, 132 B.R. 75 (N.D.Ga.1991) (same) *with In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993) (holding that new value exception still exists), *cert. granted*, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648 *dismissed*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); *In re U.S. Truck Co. Inc.*, 800 F.2d 581 (6th Cir.1986) (applying new value exception); *In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr. D.Mass.1991) (holding new value exception exists); *In re Tallahassee Assocs., L.P.*, 132 B.R. 712 (Bankr.W.D.Pa.1991) (same).

## D. *New Value Determinations Under the Code*

The question of whether the new value "exception" survived the enactment of the Code is a difficult one. Much of the difficulty, however, is due to a misconception as to what the new value "exception" is and what it is not. Therefore, before a determination can be made as the continuing viability of the new value "exception," we must first take a step back to review the creation of the "exception" and discern its intended purpose.

### 1. *Pre–Code New Value Determinations*

The common law absolute priority rule was created to prohibit equity's retention of interests in the debtor only when that retention resulted from improper and unfair means. The rule was never meant to bar the confirmation of plans in which equity's retention in the debtor was achieved fairly and was the best available option for reorganization. This conclusion was made clear by the Court in several of its early decisions.

In *Boyd*, and again in *Kansas City Terminal Ry.*, the Court noted that old equity may participate in a plan of reorganization when its contribution is either the best or last resort for funding. 228 U.S. at 508, 33 S.Ct. at 561–62; 271 U.S. at 455, 46 S.Ct. at 551–52. The Court reasserted its belief in this principle in *Los Angeles Lumber*. 308 U.S. at 121–22, 60 S.Ct. at 10–11. These cases stood for the proposition that former owners could buy back an ownership interest in a reorganized debtor if "(1) the entire value of the [debtor] had been transferred to creditors, and (2) no other investor was interested" in funding the plan. Strub, 111 Banking L.J. at 240. From the beginning, therefore, the absolute priority rule only barred equity's retention of the debtor's property when that retention was "on account of" equity's prior interests in the debtor and not when it was the result of a fair and equitable exchange, with equity acting as a normal market participant.

The new value "exception," as the Court envisioned it, therefore, was not a remarkable proposition. Indeed, the Court's statements in *Boyd, Kansas City Terminal Ry.*, and *Los Angeles Lumber* were never meant to be an exception at all but rather were simply meant to lay out "the set of conditions under which former shareholders [could] lawfully obtain [an] interest in the reorganized [debtor]." *Bonner*, 2 F.3d at 906. Thus, while some courts may have referred to statements by the Supreme Court in *Kansas Ry.* and *Los Angeles Lumber* as an "exception" to the absolute priority rule, that terminology was confusing. *See, e.g., Bonner*, 2 F.3d at 907 ("More properly, the new value exception should be called something like the 'new capital-infusion doctrine' or ... 'the scrutinize old equity participation rule.'") (quoting Elizabeth Warren, *A Theory of Absolute Priority*, 1991 Annual Survey of

American Law 9, 42); *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991); Raymond T. Nimmer, *Negotiating Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions*, 36 Emory L.J. 1009 (1987). Thus, the new value "exception" is not an exception but is instead a clarification of the absolute priority rule itself.

Because the new value "exception" is not truly an exception, the issue is not whether there is an exception that survived codification of the absolute priority rule in § 1129. Rather, the real question is whether Congress intended to bar all new value plans when it enacted § 1129 or whether it instead intended, as the Supreme Court did, to bar only those new value plans that were unfair and inequitable.

### 2. The Absolute Priority Rule Under the Code

When Congress codified the absolute priority rule it chose to not make the rule an absolute bar to equity's participation in the reorganized debtor. Section 1129 only bars the retention of the debtor's property by old equity if that retention is "on account of" old equity's prior ownership in the debtor. § 1129(b)(2)(B)(ii). If Congress had intended that old equity could never participate in a plan of reorganization then Congress could have simply eliminated the "on account of" language from the absolute priority rule.

■ What must be focused on in "new value" cases, therefore, is whether the property retained by old equity is retained "on account of" its prior interest in the debtor. It is old equity's retention of property "on account of" its prior interest, and not its participation in a plan of reorganization, that violates the absolute priority rule. Thus, the "on account of" language sets the boundaries of the absolute priority rule and defines when the rule is violated.

### 3. The New Value "Exception" Under the Code

Just as the "on account of" language in the absolute priority rule defines the boundaries of that rule, the new value "exception" helps to define the boundaries of the phrase "on account of." If an equity holder is able to satisfy the requirements of the new value "exception," then the bankruptcy court has determined that the equity holders are not receiving or retaining any property "on account of" their prior interests. By applying the new value "exception," therefore, a court is able to ensure that old equity is not unjustifiably trying to retain its prior ownership interests in the debtor, but is instead seeking participation in the reorganized debtor through fair and equitable means. In other words, the new value "exception" helps to determine when a particular contribution and retention by old equity falls outside of the boundaries established by the absolute priority rule and is not a method of excusing a violation of that rule.

■ Thus, although Congress did not explicitly state that the new value exception survived when it enacted the Code, it did so implicitly. If Congress had wanted to eliminate all "new value" plans, it would not have included the phrase "on account of" in § 1129. The inclusion of that phrase shows that Congress did not intend to preclude old equity from participating so long as it did so on the same basis as anyone else and not because of any advantage gained "on account of" its interest in the debtor. Accordingly, I hold that the new value exception survived codification of the absolute priority rule.

### E. Requirements of the New Value "Exception"

■ Traditionally, a debtor relying on the new value "exception" has had to meet five requirements. The Bankruptcy Court applied this five-part test. For old equity to retain its interests pursuant to the new value "exception," the capital contribution by old equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the property that old equity is retaining or receiving. *Varriale*, 188 B.R. at 762; *One Times Square*, 159 B.R. at 707–08 (citing *Bonner*, 2 F.3d at 908). The critical requirement of the new value rule is that a contribution by old equity be "necessary" to the reorganization efforts. In this case, I

will only discuss this requirement because I conclude that the Bankruptcy Court erred in finding that the "necessary" element of the new value "exception" had been met.

### 1. Meaning of "Necessary"

Coltex unconvincingly argues that "necessary" does not require old equity to be the "financier of last resort." (Transcript of August 28, 1996 Oral Argument at 31). Rather, Coltex argues instead that "necessary" simply means that the reorganization of the debtor requires someone "to put more money into it." (*Id.*). I disagree. If this were indeed the test, every bankrupt entity undergoing a reorganization pursuant to Chapter 11 would be able to satisfy the requirement that a contribution of new value be "necessary." If the test were as Coltex suggests, any time a debtor needed money for reorganization the "necessary" part of the new value rule would be satisfied. And since the only time old equity would put money into a debtor is if the debtor needed money for reorganization, it follows that all contributions of new value by old equity would be deemed "necessary" under Coltex's definition. This simply cannot be the case.

■ For purposes of the new value "exception," the debtor must show not only that it needs funds to reorganize but rather that it is necessary for *old equity* to contribute those funds. *Varriale*, 188 B.R. at 763. In other words, under the "necessary" requirement of the new value exception, old equity must be willing to contribute more money than any other source or it must be the lender of "last resort." *Id.; see generally* Strub, 111 Banking L.J. at 243. Before a debtor can claim that old equity's participation is "necessary," the market must be tested for other sources of funding and the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity. Only upon this showing can it be found that the infusion of new capital by old equity was "necessary" and, therefore, that old equity is not receiving any property "on account of" its prior interests.

■ Obviously, this means that old equity may not be given the exclusive right to bid on the debtor's property. Several courts have held that where a reorganization plan gives old equity the exclusive right to receive or retain an interest in the reorganized debtor in exchange for new value, the old equity holders are given property "on account of" their prior interests. *In re Bryson Properties*, 961 F.2d 496, 504 (4th Cir.1992); *see also Piedmont Assocs. v. Cigna Prop. & Cas. Ins.*, 132 B.R. 75, 79 (N.D.Ga.1991); *In re Outlook/Century Ltd.*, 127 B.R. 650, 653–54 (Bankr.N.D.Cal.1991). Under this analysis, the exclusive right of old equity to contribute new capital "to 'buy' the property without exposing it to the market or otherwise allowing any other party ... the opportunity to bid" constitutes property, albeit intangible property, that old equity receives or retains "on account of" its prior interests. *In re Bryson Properties*, 961 F.2d at 504; *but see Bonner*, 2 F.3d at 910. In effect, the equity holders are controlling the sale of the property through the reorganization plan and thereby ensuring themselves a bargain basement price.

■ To satisfy the "necessary" element of the new value "exception," however, it is not enough to simply demonstrate that a plan was nonexclusive. It must also be shown that the debtor undertook a diligent search for alternative sources of funding. As Judge Connelly stated:

[T]he record does not support a finding that this debtor had approached and been rebuffed by other entities to obtain financing elsewhere, and that as a consequence, old equity is the only source of commercially reasonable financing available to the debtor. In short, the equity holders are not the lenders of last resort but rather the lenders of first opportunity. Such self-dealing cannot be countenanced.

*Varriale*, 188 B.R. at 763. Only by demonstrating that a search was undertaken can it be shown that old equity did not get a bargain and did not retain any of the debtor's property "on account of" its prior interests.

### 2. *The Partners' Contribution of New Value Was Not "Necessary"*

 In the present case, the Partners were the only parties afforded the right to contribute new capital. In effect, they were allowed to "buy" the Property without exposing it to the market or otherwise allowing any other party the right to bid. The Partners were afforded an opportunity not afforded to anyone else. This exclusive right to contribute constituted "property" under § 1129(b)(2)(B)(ii), property that was received or retained by the Partners "on account of" their prior interest in Coltex.

By virtue of the exclusive right, the Partners were able to retain their equity in Coltex, and Coltex was able to retain the Property, without a diligent search being undertaken for alternative sources of funding. At trial, Joseph Lambert, one of the Partners, testified that Coltex had approached only one lender in the prior year in an effort to obtain equity or other financing for the Property. (Tr. at 1744–45). Lambert also testified that Coltex had not retained any mortgage brokers or other outside consultants in an effort to locate alternate sources of equity or financing. (Tr. at 1746). In fact, Mr. Lambert admitted that the Partners never even considered bringing in new equity as an alternative means of obtaining money to fund the Plan. (Tr. at 1744–45). Hence, the Partners did not make a diligent search for alternative sources of funding.

The Bankruptcy Court made certain findings that arguably stand for the proposition that a diligent search for alternative sources had been made. The Bankruptcy Court found that

> [the limited partners'] capital contribution is necessary for a successful reorganization, for without the new value contribution, [Coltex] would be unable to satisfy the claims of its creditors.... The Debtor was unsuccessful in its alternative effort to fund a plan, including obtaining equity from other sources or to obtain financing for the Property on a stand-alone basis.

(J.D. at 118, ¶ 48). As Mr. Lambert's testimony made clear, however, the "alternative effort" consisted of approaching only one lender. Moreover, no mortgage brokers or outside consultants were retained, nor did Coltex make any effort to find sources of new equity. Hence, to the extent the Bankruptcy Court found that a diligent search had been made, that finding was clearly erroneous.

In this case, because of their equity interests, the Partners were given the exclusive right to contribute new capital. As a result, and on account of their equity interests, they were able to retain their ownership interest in the Property while paying less than half of their debt. At the same time, BT/SAP's security interest in the Property was extinguished while it was paid less than half of what it was owed.

Because they had the exclusive right to bid, the Partners did not demonstrate that their contribution of new capital was "necessary" to the reorganization efforts. No diligent search for alternate sources of funding was undertaken and the Property was not exposed to the market. Hence, the Plan fails to satisfy the requirements of the new value "exception," for it fails to conform to the strict requirements of the absolute priority rule as codified in § 1129 of the Code. Accordingly, the Plan should not have been confirmed.

### CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court confirming the Plan is reversed and confirmation of the Plan is denied.

SO ORDERED.