138 F.3d 39
 39 Collier Bankr.Cas.2d 656, 32 Bankr.Ct.Dec. 179,
Bankr. L. Rep. P 77,634
 In Re: COLTEX LOOP CENTRAL THREE PARTNERS, L.P., Debtor.
COLTEX LOOP CENTRAL THREE PARTNERS, L.P., Debtor-Appellant,
v.
BT/SAP POOL C ASSOCIATES, L.P., Creditor-Appellee.
 Docket No. 96-5140.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 15, 1997.
Decided Feb. 19, 1998.
 
 Peter D. Wolfson (Suzanne D.T. Lovett, Pryor, Cashman, Sherman & Flynn, New York City, on the brief), for Debtor-Appellant.
 Michael Luskin (Lori Lapin Jones and Etty M. Pollack, Luskin, Stern & Eisler LLP, New York City, on the brief), for Creditor-Appellee.
 Before: JACOBS and LEVAL, Circuit Judges, and RESTANI, Judge.*
 RESTANI, Judge:
 
 
 1
 This is an appeal from a judgment of the district court reversing a bankruptcy court order confirming a Chapter 11 cramdown reorganization plan (the "Plan"). The Plan allows pre-bankruptcy equity holders to retain the primary asset of the debtor based on a new capital contribution. We affirm the district court's decision that the Plan does not meet the requirements of confirmation set forth in 11 U.S.C. § 1129 (1994).
 
 JURISDICTION AND STANDARD OF REVIEW
 
 2
 The district court had jurisdiction pursuant to 28 U.S.C. § 158(a) and we have jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291. This court's appellate review of a district court's review of a bankruptcy court order is plenary. Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1388 (2d Cir.1990). We review the bankruptcy court's factual findings for clear error. Id.
 
 FACTS
 Background
 
 3
 The facts, undisputed by the parties and as articulated by the district court, are as follows.
 
 
 4
 Appellant Coltex Loop Central Three Partners, L.P. ("Coltex"), a limited partnership consisting of one general partner and six limited partners (the "Partners"), was organized under the laws of the state of Delaware in 1990. Coltex's primary asset is a ten-story office building in Houston, Texas. Coltex purchased the property in June 1990 for $8,500,000, financing approximately $6,400,000 of the purchase price with funds obtained from a secured loan from an affiliate of the Bank of Boston.
 
 
 5
 In 1994, the loan documents were assigned to appellee BT/SAP as part of a portfolio purchase by BT/SAP from the Bank of Boston. At the time of the assignment to BT/SAP, Coltex was in default under the loan. On January 6, 1995, BT/SAP notified Coltex that it was in continued default under the loan agreements and that if it did not cure the default, the property would be posted for foreclosure on February 7, 1995. On February 6, 1995, Coltex paid $25,000 to BT/SAP in exchange for which BT/SAP agreed to adjourn the upcoming foreclosure sale for a period of one month. On February 9, 1995, BT/SAP notified Coltex that the sale would occur on March 7, 1995.The Filing of the Petition
 
 
 6
 On March 7, 1995, just prior to the foreclosure sale, Coltex filed a Chapter 11 petition with the United States Bankruptcy Court for the Southern District of New York. The foreclosure sale was automatically stayed under 11 U.S.C. § 362. After an initial dispute as to the amount due on the loan, BT/SAP and Coltex stipulated that BT/SAP's total claim was $7,200,000. Coltex's schedule also listed other general unsecured claims of approximately $123,000 and various tax claims of approximately $355,000.
 
 The Plan
 
 7
 In September 1995, during its exclusive period for submitting a plan, Coltex submitted its Third Amended Plan of Reorganization. The bankruptcy court did not permit a shortening of the exclusivity period so that BT/SAP could submit its own plan, which proposed to pay non-insider unsecured creditors in full. Coltex's Plan contained the following classes and proposed the following treatment:
 
 
 8
 Class 1 Tax Claims--Cash payment of essentially the full amount of the claims.
 
 
 9
 Class 2 BT/SAP Secured Claim--Option on the part of Coltex to pay the claim either in cash on the effective date or over time. Coltex later decided to pay cash on the effective date.
 
 
 10
 Class 3 Unsecured Claims--(including BT/SAP's unsecured deficiency claim)--To be paid 10% of allowed amount of claim in cash.
 
 
 11
 Class 4 Equity Interests of Partners--To be retained.
 
 
 12
 The Plan permitted the Partners to contribute money to Coltex and, in return, to retain their interests in Coltex post-confirmation. At trial, Joseph Lambert ("Lambert"), a limited partner and executive vice president of the general partner of Coltex, testified that the Partners, i.e., the equity holders, would be funding the Plan, which required approximately $3.4 million. Lambert further testified that Coltex had approached only one lender in approximately the last year in an effort to obtain equity or other financing for the property and that the request was rejected. Lambert also stated that within the prior year Coltex had not retained any mortgage brokers or outside consultants to help locate other sources of equity or financing and, apart from BT/SAP, the Partners did not consider bringing in new equity partners as an alternative means of obtaining money to fund the Plan.
 
 
 13
 BT/SAP objected to the Plan on the grounds, inter alia, that (1) it incorrectly valued the Property at $2.95 million (BT/SAP's appraisals valued the Property at $5.7 million); (2) the tax claims were artificially impaired so as to create an impaired class allowing Coltex to achieve a "cramdown" of the Plan over BT/SAP's objections; and (3) the Plan violated the requirements of the "absolute priority rule."
 
 The Bankruptcy Court's Decision
 
 14
 On May 21, 1996, the bankruptcy court issued its "Order Confirming Debtor's Third Amended Plan of Reorganization Dated September 13, 1995" over the objections of BT/SAP. The bankruptcy court set the value of the Property at $2.95 million and held that consequently "the capital infusion by the [Partners] satisfies 11 U.S.C. § 1129(b) and the 'new value' exception to the 'absolute priority rule.' "
 
 The District Court's Decision
 
 15
 The district court reversed. It reasoned that while the absolute priority rule as codified in 11 U.S.C. § 1129(b)(2)(B)(ii) does not always bar old equity's participation in a plan of reorganization, it does bar participation if it is "on account of" the prior interest. BT/SAP Pool C Assocs., L.P. v. Coltex Loop Central Three Partners, L.P., 203 B.R. 527, 534 (S.D.N.Y.1996). The court explained that the interest received under the new Plan would not be on account of the prior interest if the five-part "new value" test was met. Id. Under the five-part test, the capital contribution by the old equity holders must be new, substantial, money or money's worth (not future labor, goodwill, etc.), necessary for a successful plan of reorganization, and reasonably equivalent to the value of the property to be retained by old equity. Id.; see also Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership ), 2 F.3d 899, 908 (9th Cir.1993), cert. granted, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), appeal dismissed as moot, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). The district court found the debtor failed to establish that old equity's "new value" contribution was "necessary," because other avenues for funding a successful reorganization had not been adequately explored. BT/SAP Pool C Assocs., 203 B.R. at 536. The court stated that because old equity was the lender of first opportunity, rather than the lender of last resort, old equity would receive its interest on account of its prior subordinate status, in violation of the absolute priority rule. Id. The court also noted the extinguishment of half of the secured creditor's debt, the lack of exposure of the property to the market, and the lack of fair opportunity for bids from other parties. Id. Accordingly, the district court reversed the bankruptcy court and found the Plan unconfirmable. Id.
 
 DISCUSSION
 
 16
 The numerous lower courts and three courts of appeals which have addressed the issue presented here have employed different reasoning to reach variable results. Both the Ninth Circuit in Bonner Mall, 2 F.3d at 908-09, and the Seventh Circuit in In re 203 N. LaSalle Street Partnership, 126 F.3d 955, 971-72 (7th Cir.1997)(Kanne, J., dissenting), have found, in essence, that the debtor's opportunity to submit a new value plan for confirmation without subjecting the primary asset of the debtor to market bids does not cause old equity to receive anything "on account of" its prior interest, and thus complies with the absolute priority rule.[1] The Fourth Circuit in Travelers Insurance Co. v. Bryson Properties XVIII (In re Bryson Properties, XVIII ), 961 F.2d 496, 504 (4th Cir.1992), reached a different conclusion.[2] We find the reasoning of the dissent in LaSalle, 126 F.3d at 970-73, and the Fourth Circuit in Bryson, 961 F.2d at 504, which adopt a plain reading of the statute, persuasive. Although the reasoning for our conclusion has been explained very well by the dissent in LaSalle, it may be useful to reiterate it, in part, here. We begin with the statute.
 
 
 17
 Generally, a Chapter 11 reorganization plan may be confirmed only with the assent of each class of impaired creditors. 11 U.S.C. §§ 1126(c); 1129(a)(8). If an impaired class of creditors rejects a plan, however, the plan, nonetheless, may be confirmed if the other requirements of confirmation are met and the plan is "fair and equitable." 11 U.S.C. § 1129(b)(1) (the so-called "cramdown" provision). One of the attributes of a fair and equitable plan is that if an unsecured creditor is not paid in full, "the holder of any claim or interest that is junior to the claims of [the unsecured creditor] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). This is the "absolute priority rule." As will be explained, we think it is clear that the former equity holders, who are junior to the unsecured creditor class, will receive property under the Plan on account of their former interest, and that the Plan, thus, is not fair and equitable under the Code.
 
 
 18
 In bankruptcy terms, "property" is not a narrow concept. See 11 U.S.C. § 541 (1994) (defining property for bankruptcy Code purposes). Although the legislative history does not deal expressly with the issue at hand, see Bryson, 961 F.2d at 505 n. 13, it is clear that a broad definition of property is intended to apply in this instance. See 11 U.S.C. § 541. With regard to 11 U.S.C. § 1129(b)(2)(B)(ii), Congressman Edwards stated "the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all." 124 Cong. Rec. 32,408 (1978) (emphasis added). Thus, the exclusive right to retain the debtor's property upon making a capital contribution is itself property, but it is not even necessary to reach that level of abstraction.
 
 
 19
 Under the Plan, old equity will retain the real estate of the debtor on account of its prior property interest. The unsecured creditors meanwhile are to receive ten cents on the dollar and, therefore, will not be paid in full. Despite Coltex's major creditor's attempt to invade the debtor's exclusive plan period and despite the lack of a market test of value, old equity simply will retain the real estate of the debtor. As the court in Bonner, 2 F.3d at 909, and the majority in LaSalle, 126 F.3d at 964, were forced to acknowledge, this is not simply receiving the real estate on account of the new capital contribution, it is also receiving the real estate on account of equity's prior position and the rights emanating from that position. In contrast to LaSalle and Bonner, we conclude that in this case such perquisites are not merely tangentially related to old equity's receipt under the Plan of the debtor's primary asset.
 
 
 20
 Our decision fully accords with the Supreme Court's stated reluctance to depart from judge-approved practices that existed before the enactment of the 1978 Code. In Dewsnup v. Timm, 502 U.S. 410, 417, 419-20, 112 S.Ct. 773, 778, 779-80, 116 L.Ed.2d 903 (1992), the Supreme Court found an ambiguity in 11 U.S.C. § 506 and then immediately turned to pre-Code practice to resolve the ambiguity. In the case of a statutory ambiguity the Court apparently looks for an expression in legislative history of Congressional desire to override prior judge-made bankruptcy law before abandoning old precedents. Id. at 419, 112 S.Ct. at 779. The Dewsnup approach is not viable here. First, at the very least, as applied to a single real property asset case, as is before us, the language of the statute is not ambiguous. See Bryson, 961 F.2d at 504. Where the statutory language is clear the Supreme Court will reject prior bankruptcy practice, without an expression of intention in the legislative history to reject the practice. See Union Bank v. Wolas, 502 U.S. 151, 155-57, 159, 112 S.Ct. 527, 529-31, 532, 116 L.Ed.2d 514 (1991) (rejecting attempt to import prior judicially crafted current expense limitation to list of exceptions to avoidable preferences under 11 U.S.C. § 547(c)).
 
 
 21
 As applied here, the words "on account of" in § 1129 seem very straightforward. If Congress had intended to modify those words with the addition of the words "only," "solely," or even "primarily," it would have done so. For the court to add such modifiers would work a significant and unwarranted change in the meaning and consequence of the statute. Thus, we conclude that if old equity's new interest under the plan results in any significant way from its old status, the plan may not be confirmed.
 
 
 22
 Second, the Code in this area is so different from the prior Bankruptcy Act that the old practice simply cannot be imported in toto into practice under the new Code. See Wolas, 502 U.S. at 160, 112 S.Ct. at 532-33 ("In light of these substantial changes in the preference provision, there is no reason to assume that the justification for narrowly confining the 'current expense' exception to trade creditors before 1978 should apply to the ordinary course of business exception under the 1978 Code."). We quote from the dissent in LaSalle:
 
 
 23
 Moreover, the bankruptcy law principles underlying the "creation" and "development" of the new value exception differ greatly from those under the present Bankruptcy Code. Prior to the enactment of the Code in 1978, bankruptcy law consisted of a number of provisions differing from each other regarding the confirmation of reorganization plans and the existence of "fair and equitable" standards in those situations. In Case[v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939)], for example, Section 77B of the Bankruptcy Act of 1898 required that creditors unanimously consent to a debtor's reorganization plan and that the plan meet a "fair and equitable" standard developed under the common law. Section 77B, which lasted only 4 years, quickly gave way to Chapters X and XI of the Bankruptcy Act. Chapter X retained Section 77B's "fair and equitable" requirement, and it mandated the appointment of a disinterested trustee to control the reorganization of the debtor.[5]
 
 
 24
 Chapter XI included a "fair and equitable" rule when enacted in 1938, but that concept was repealed from Chapter XI in 1952.[6]
 
 
 25
 The enactment of the Bankruptcy Code in 1978, however, fundamentally changed this bankruptcy backdrop. Chapter 11 of the Code "reflects a melding of concepts derived from several [of these and other] distinct bodies of pre-Code law" combined with the "conscious purpose ... to create a new chapter that represented the best of all these approaches to reorganization." Significantly, the Code eliminated the unanimous consent requirement among creditors, see 11 U.S.C. § 1126(c), and it required a "fair and equitable" test whenever an impaired class of creditors rejects a reorganization plan, see 11 U.S.C. § 1129(b)(1). The Code, moreover, provided the first codification of this "fair and equitable" test. See 11 U.S.C. § 1129(b)(2). The present, increased flexibility in confirming reorganization plans coupled with new codifications thus represents a significant change from pre-Code bankruptcy law and arguably renders the new value exception unnecessary.
 
 
 26
 126 F.3d at 974-75 (Kanne, J., dissenting) (internal citations omitted).
 
 
 27
 When the Supreme Court in Case, 308 U.S. at 121, 60 S.Ct. at 10, recognized the new value exception in dicta, trustees managed reorganization proceedings, and the equitable powers of bankruptcy judges were largely undefined by statute. This is no longer the case. For the most part debtors remain in control of their property, and the former protections against self-dealing afforded by trustee and bankruptcy judge control are no longer present. See In re A.V.B.I., Inc., 143 B.R. 738, 743 (Bankr.C.D.Cal.1992) (suggesting trustee control in former reorganization proceedings as a reason a "new value" exception might not have been objectionable). The greater flexibility afforded debtors under the Code reflects a Congressional judgment that reorganization is often preferable to liquidation, but Congress recognized the dangers, as well as the benefits of this approach, and provided certain limitations. The Code thus strikes a considered balance between creditor and debtor interests, which creditors, debtors, and courts must scrupulously respect. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988) (rejecting old equity's offer of "labor experience, and expertise" as basis for exception to absolute priority rule and declining to decide viability of "new value" exception of Case).[3] When the courts add to the rights of either side, they upset the balance sought to be achieved by Congress.
 
 
 28
 Applying these principles to this case, the issue becomes whether Coltex's Partners obtain or retain their interest in the debtor's property on account of their prior equity position or whether their retention of the real estate is on account of their new equity infusion. Based on the facts of this case, it is apparent that the Partners could not have gained their new position but for their prior equity position. In this case, BT/SAP was ready with a plan of its own, which proposed to pay non-insider unsecured creditors in full. It would have left Coltex's Partners with nothing. They, like anyone else, could have attempted to purchase the Property at market price. Instead, under the Plan, the Partners avoid foreclosure by BT/SAP and obtain the Property at a set price untested by market forces, leaving the unsecured creditors with a ten percent recovery. Common sense suggests that the Partners believe that they are getting a bargain by virtue of their previous position,[4] which enables them to avoid both competing reorganization plans and competing bids for the property.
 
 
 29
 We note that, even if we were to rely on the traditional framework for evaluating new value exceptions to the absolute priority rule, we would reach the same result. One of the traditional requirements for confirming a plan under the new value exception is that the equity holder's contribution be "necessary" to the effective reorganization of the debtor. See, e.g., Case, 308 U.S. at 121, 60 S.Ct. at 10 (noting "the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where the necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made."); Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 455, 46 S.Ct. 549, 552, 70 L.Ed. 1028 (1926) ("Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them, unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them."); Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 503-04, 33 S.Ct. 554, 559-60, 57 L.Ed. 931 (1913) ("The enormous value of corporate property often makes it impossible for one, or a score, or a hundred bondholders to purchase, and equally so for stockholders to protect their interest. A combination is necessary to secure a bidder and to prevent a sacrifice. Co-operation being essential, there is no reason why the stockholders should not unite with the bondholders to buy in the property.") (emphasis added); In re Sovereign Group, 142 B.R. 702, 708-09 (E.D.Pa.1992) (citing cases).
 
 
 30
 As Judge Chin held below, "under the 'necessary' requirement ... old equity must be willing to contribute more money than any other source [for the interest it would receive] or it must be the lender of 'last resort.' " Old equity must do more than demonstrate that new capital is necessary for a successful reorganization. The old owners must also show that the reorganized entity "needs funds from the prior owner-managers because no other source of capital is available. " Michael H. Strub, Jr., Competition, Bargaining and Exclusivity under the New Value Rule: Applying the Single Asset Paradigm of Bonner Mall, 111 Banking L.J. 228, 243 (1994). This view of the "necessity" test finds considerable support from bankruptcy courts and scholars. See Strub, supra, at 244 n. 82 (citing authority). More importantly, the Supreme Court took pains to "stress" that old equity participation would be "necessary" only where the success of the reorganization hinged on "new money ... from the old stock holders." 308 U.S. at 121, 60 S.Ct. at 10 (quotation marks omitted) (emphasis added); see also Kansas City Terminal Ry. Co., 271 U.S. at 454-56, 46 S.Ct. at 551-52; Boyd, 228 U.S. at 503-04, 33 S.Ct. at 559-60. Finally, this reading responds to Congress's clear concern that old equity not participate in a reorganized entity 'on account of' it prior status.[5]
 
 
 31
 Here, the bankruptcy court applied the wrong legal standard in finding that the new equity infusion by old equity was essential to a successful reorganization. It should be remembered that Coltex is not a business enterprise with employees who may be displaced or production which may be halted. It is an entity which holds title to a parcel of real estate. Failure to accept the Plan of the debtor does not mean that the business will fail in the normal sense of that concept. Under the conditions at hand any number of plans may be considered a "successful reorganization," not simply one which makes little change in ownership.[6]
 
 
 32
 We also note that, contrary to appellant's argument, the opportunity of a secured creditor to make an election under 11 U.S.C. § 1111(b) does not change the result. Section 1111(b) provides an option to an undersecured creditor to have its undersecured claim treated as a fully secured claim with its lien remaining to support the full amount of its claim. If an election is made, however, the debtor is not required to pay the face amount of the claim. Although the aggregate payments over time must amount to the face amount of the claim, such payments need only have a present value equal to the amount of the secured portion of the claim as of confirmation. See 11 U.S.C. § 1129(b)(2)(A)(i)(II). Had BT/SAP made an election under § 1111(b), it would have been entitled to receive payments over time that had an aggregate value of $7,200,000, but that had a present value of only $2,950,000. It would also have lost the 10% distribution (approximately $420,000) that it was to receive under the Plan on its unsecured deficiency claim. That a secured creditor may choose the § 1111(b) option does not change, in any relevant way, what is "fair and equitable" or the meaning of the codified absolute priority rule. There is nothing in the wording or the structure of the statute that leads to such a conclusion.
 
 
 33
 As this Plan is not confirmable, like the district court, we do not reach the issue of whether the Plan was accepted by an impaired class of creditors (here the tax claimants), an additional requirement for confirmation of this type of plan found at 11 U.S.C. § 1129(a)(10).
 
 
 34
 In conclusion, we hold that any plan providing for old equity to contribute new capital to fund a Chapter 11 reorganization cramdown plan, is limited by the various requirements for confirmation set forth in 11 U.S.C. § 1129, including 11 U.S.C. § 1129(b)(2)(B)(ii). Each such plan must be examined to make sure that old equity does not retain or receive property of the debtor "on account of" its prior subordinate position. Where no other party seeks to file a plan or where the market for the property is adequately tested, old equity may be able to demonstrate that it can meet the requirements of 11 U.S.C. § 1129 and that, in essence, it receives nothing on account of its prior position. This is not such a case. This was an insider's plan for the benefit of insiders. It was of little benefit to any creditor, and the major creditor was stymied in its legitimate attempts to obtain the value of its claims. The Plan was not fair and equitable.
 
 
 35
 The judgment of the district court is affirmed.
 
 
 
 *
 Honorable Jane A. Restani, United States Court of International Trade, sitting by designation
 
 
 [1]
 We note some factual distinctions between these two cases and the one at hand. For the first 120 days of a reorganization the debtor has the exclusive right to submit a plan for confirmation. 11 U.S.C. § 1121(b) (1994). In Bonner Mall this period had expired. 2 F.3d at 910 n. 26. In LaSalle it does not appear that the lender attempted to file a competing plan and the debtor's plan contained various protections for the lender's claims. 126 F.3d at 959
 
 
 [2]
 In Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581, 588 (6th Cir.1986) the court recognized a new value exception to the absolute priority rule without discussing the 1978 Code or the possible limitations of the "exception." In 1992, the Fifth Circuit on rehearing deleted the discussion of the lack of a new value exception in Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture ), 995 F.2d 1274, 1284 (5th Cir.1991)(Jones, J. dissenting from the deletion)
 
 
 [5]
 Under Chapter X, no shareholder ever convinced a court that it contributed sufficient value to retain an interest under the new value concept, and no reported case expressly adopted Case's new value dicta as its holding until the Code's enactment in 1978
 
 
 [6]
 Because the absolute priority rule no longer applied to Chapter XI proceedings after 1952, cases under that chapter did not address any new value issues. The number of parties that could potentially seek application of new value principles further declined due to a preference for filing under Chapter XI rather than Chapter X, which is partially explained by Chapter X's disinterested trustee requirement
 
 
 [3]
 See also John D. Ayer, Rethinking Absolute Priority After Ahlers, 87 Mich. L.Rev. 963, 1012-13 (1989) (arguing the pre-Code "new value" exception was an illusion) [hereinafter "Ayer"]
 
 
 [4]
 This sense of additional unaccounted for value is alternatively explained in Ayer, supra, at 1012-13, which gives examples of equity contribution as an addition to the value of the asset which must be paid to secured creditors
 
 
 [5]
 We reject the Ninth Circuit's suggestion (in dictum) that the old owners satisfy the necessity element of the new value exception by showing that they are the "most feasible" source of fresh capital. See Bonner Mall, 2 F.3d at 911, n. 30. The Supreme Court has stressed the necessity, not the feasibility, of seeking new money from old equity. 308 U.S. at 121. In our view, using "most feasible source" as a standard affords insufficient protection for creditor interests, which should be guarded against old equity participation unless truly necessary. We believe that Bonner Mall, in endorsing the less protective "most feasible" standard, has misread Supreme Court authority
 
 
 [6]
 Given our primary holding and the bankruptcy court's failure to assess "necessity" in the proper legal context, we need not review the district court's determination that the bankruptcy court erred in its factual finding of adequate attempts to find a lender to fund this particular plan. Nor is it necessary to address the bankruptcy court's valuation of the property