**In re DWELLCO I LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 97–20396.**

United States Bankruptcy Court, D. Connecticut.

March 23, 1998.

Howard L. Siegel, Brown, Rudnick, Freed & Gesmer, Hartford, CT, for Debtor.

Craig I. Lifland, Zeisler & Zeisler, Bridgeport, CT, for Ocwen Federal Bank, FSB, Creditor.

Anthony S. Novak, Chorches & Novak, Wethersfield, CT, for trustee.

Keith N. Costa, Office of United States Trustee, New Haven, CT.

## MEMORANDUM OF DECISION AND ORDERS ON COMMOTION OF TWO COMPETING PLANS OF REORGANIZATION

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

The court has held confirmation hearings on two competing Chapter 11 plans of reorganization—one submitted by Dwellco I Limited Partnership ("the debtor"), the Chapter 11 debtor, and the other by Ocwen Federal Bank FSB ("Ocwen"), an undersecured nonrecourse creditor.[1] Both plans require "cram down" because not all impaired classes accepted them. The debtor has acknowledged throughout the confirmation process that its plan relies upon "whether the so-called 'new value exception' will be recognized in this District." *Debtor's Response To Objection And Supplemental Disclosure* at 10. Under Ocwen's self-described liquidating plan, Ocwen receives its collateral and satisfies administrative, trade, and employee wage and benefit claims.

Following conclusion of the confirmation hearing, the U.S. Court of Appeals for the Second Circuit held, under facts generally comparable to those in the instant case, that the court would not rely on the "the traditional framework for evaluating new value exceptions to the absolute priority rule." *In re Coltex Loop Central Three Partners, L.P. (Coltex Loop Central Three Partners, L.P. v. BT/SAP Pool C Associates, L.P.)*, 138 F.3d 39 (2d Cir.1998).[2] For reasons hereinafter stated, confirmation of the Modification of Debtor's Second Amended Plan of Reorganization (the "debtor's plan") filed on October 9, 1997, is denied. Confirmation of Ocwen's Second Amended Joint Liquidating Plan of Reorganization ("Ocwen's plan"), filed on July 31, 1997, is granted.

### II.

### BACKGROUND

The debtor is a Connecticut limited partnership formed in June 1985 for the purpose of acquiring a 561–unit apartment complex, known as Prescott Glen Apartments ("Prescott Glen"), located in East Hartford, Connecticut. Dwellco Development Corporation ("DDC"), the debtor's single general partner, holds a .5% ownership interest. Colonial Realty Company, the single special limited partner, also holds a .5% ownership interest.[3] One hundred eighteen investor limited partners hold the remaining 99% ownership interest in the debtor. Konover Residential Corporation manages Prescott Glen under the oversight of DDC.

The debtor acquired Prescott Glen in July 1985 with an $18,700,000 first mortgage loan obtained from DRG Funding Corporation. In 1992, the Department of Housing and Urban Development ("HUD") acquired the mortgage, and, in August 1996, HUD sold the mortgage to Ocwen as part of a larger loan portfolio sale. The mortgage loan balance at the time Ocwen purchased it was approximately $21,300,000 due to interest deferral arrangements the debtor had negotiated with HUD under a workout agreement.

---

1. Anthony S. Novak, the Chapter 11 trustee, joined in the submission of Ocwen's plan, but, stated during the confirmation hearings that he supports either plan since each pays unsecured trade creditors in cash and in full.

2. Confirmation hearings concluded on December 16, 1997, and briefing was completed on January 23, 1998. The Second Circuit Court of Appeal issued its ruling on the new value exception on February 19, 1998.

3. Colonial Realty Company was originally a co-general partner but as a result of its own bankruptcy proceedings, its interest was converted to that of a special limited partner with no management responsibilities or control of the debtor.

The loan documents included a collateral assignment of leases and rents.

The debtor defaulted on a mortgage payment due November 1, 1996, and Ocwen accelerated the entire loan indebtedness, which the debtor could not pay. Ocwen started a mortgage foreclosure action in December 1996. The debtor filed its Chapter 11 petition on January 30, 1997, staying the foreclosure. Within thirty days before filing its petition, the debtor had repaid $300,000 on an unsecured loan due DDC. When the debtor refused to seek a return of the $300,000 from DDC, the court, on Ocwen's motion, on May 16, 1997 ordered the appointment of a Chapter 11 trustee to replace the debtor as debtor in possession. The U.S. Trustee appointed Anthony S. Novak as Chapter 11 trustee.

The debtor filed a motion asking the court to determine the present value of Prescott Glen. Following two days of valuation testimony, the court, on September 19, 1997, determined the value to be $12,100,000. The court, after approving the debtor's and Ocwen's disclosure statements, entered an order establishing September 30, 1997, as the deadline for completing voting on the two plans. Confirmation testimony for both plans concluded on December 16, 1997, and the debtor and Ocwen thereafter submitted extensive posthearing memoranda.[4]

### III.

### THE DEBTOR'S PLAN

The debtor's plan classifies claims and interests into eight classes. Class One contains the Town of East Hartford's $197,425 secured claim for unpaid real property taxes, which would be paid with 8.25% annual interest in monthly installments on a five year amortization schedule, with a balloon payment on the third anniversary of the plan's

effective date. Class Two is Ocwen's secured claim of $11,902,575.[5] The plan proposes to pay Ocwen approximately $1,000,000 on the effective date and pay the balance of the claim with "market rate" interest in monthly installments on a thirty-year amortization schedule, with a balloon payment on the tenth anniversary of the effective date. Class Three consists of the debtor's employees' wage claims, which would be paid in full in two installments, without interest, over the first year after the effective date. Class Four comprises employee benefit claims, to paid in the same manner as the Class Three claims.

Class Five consists of trade claims amounting to $36,843, which the plan proposes to pay in cash in full with 9% interest on the effective date. Class Six, unsecured claims other than trade claims, consists of Ocwen's unsecured claim[6] of approximately $10,000,000 and approximately $5,000,000 in claims against the debtor by DDC and related entities. These claims would receive on the plan's effective date their *pro rata* share of assets of the estate, without interest. Ocwen's unsecured claim would concededly thereby receive a cash distribution of less than 1%. Class Seven comprises claims for damages asserted by limited partners against the debtor, DDC, and DDC's affiliates arising from the purchase or sale of limited partnership units (the "limited partner damage claims"). These claims would receive nothing. Lastly, Class Eight contains equity interests of the debtor's investor limited partners, which would be retained. The plan questionably lists every class but Class Five as impaired.

The debtor's plan proposes to fund the reorganization by creating a new corporation called "Newco," defined as "DDC's affiliated corporation,"[7] to make a new value contribution of $1,600,000 plus the cash required to pay trade claims. The new value contribu-

---

4. Prior to the confirmation hearing, the United States Trustee submitted a written statement that she supports confirmation of Ocwen's plan and does not support confirmation of the debtor's plan. The Town of East Hartford submitted a statement supporting the debtor's plan.

5. The $12,100,000 value of Prescott Glen less the $197,425 unpaid town tax lien.

6. *See* 11 U.S.C. § 1111(b)(1)(A).

7. DDC's sole shareholders and directors will be Newco's sole members, and DDC will manage Newco. *See Transcript of Confirmation Hearing,* October 31, 1997, at 87, 93.

tion would be used solely for "immediately necessary" capital repairs to Prescott Glen, including repair and/or replacement of soffits and roofs and renovation of interior hallways.

In return for contributing the $1,600,000 in new value, Newco would receive the right to designate the holders of all post-confirmation general and limited partner interests in the reorganized partnership, the right to receive a partnership administration fee of 1% of the debtor's monthly gross income, and a release of the debtor, DDC, and all affiliates from the $300,000 preference claim and limited partner damage claims. Newco would designate itself the sole general partner and designate all of the debtor's investor limited partners as limited partners in the reorganized debtor, in the same respective percentage ownership interest as these partners currently hold. Each partner would have the right to invest additional cash in the debtor, and Newco's new value contribution would be reduced by the amount of such investments.

The plan provides for a so-called "priority return" of the debtor's excess cash flow. Excess cash flow would first be used to repay the new value investment, plus a 15% return, compounded annually. Once the new value investment was repaid, excess cash flow would be allocated between Newco and the partners.

Class Two, Ocwen's secured claim, and Class Six, all unsecured claims other than trade claims, voted to reject the debtor's plan.

## IV.

### OCWEN'S PLAN

Ocwen's plan classifies claims and interests into seven classes. Class One is Ocwen's $21,684,026 claim. To satisfy this claim, the plan proposes that on the plan's effective date the debtor convey to Ocwen Prescott Glen and all cash remaining after the trustee makes distributions in accordance with the plan. Class Two, employee wage claims, and Class Three, employee benefit claims, would be paid in full in cash on the date on which initial distributions under the plan are made ("the distribution date"). The plan would pay Class Four, non-insider general unse-

cured claims, in full in cash on the distribution date, with 9% interest accruing from the petition date through the distribution date.

Class Five contains the "affiliated debt": an estimated $5,030,252 in unsecured claims of Colonial Realty Corporation, DDC, and other entities related to DDC's president, Simon Konover. These claimants would share *pro rata* any recoveries the trustee obtains in avoidance actions and any proceeds from the liquidation of unencumbered assets. If the court were to refuse to allow Ocwen to classify the affiliated debt separately from the general unsecured claims, then Classes Four and Five would be merged and share in a pro rata distribution of $36,840. Class Six consists of the limited partner damage claims, which would be extinguished and receive nothing. Class Seven comprises the equity interests, which would be canceled and extinguished on the effective date. Classes One, Five, Six, and Seven are listed as impaired.

Under Ocwen's plan, the Town of East Hartford's $197,425 claim, which is not classified, is paid in full in cash on the distribution date. The plan provides that on the effective date, the trustee would convey Prescott Glen and all collateral securing Ocwen's claim to Ocwen or its nominee. The trustee would pursue avoidance actions and sell all the debtor's personal property that is not subject to Ocwen's liens for the benefit of Class Five claimants, take all steps necessary to make all distributions and payments required by the plan, and be discharged.

Class Five voted to reject the plan, and classes Six and Seven are deemed to have rejected it.

## V.

### CONFIRMATION REQUIREMENTS

Section 1129 of the Bankruptcy Code (the "Code") governs confirmation of a Chapter 11 plan. Under the Code's general confirmation standards, if a plan meets each of the thirteen requirements in § 1129(a), including the requirement in § 1129(a)(8) that every impaired class of claims or interests accept the plan, the court must confirm the plan. If

at least one impaired class votes to reject the plan, then, so long as "at least one class of claims that is impaired under the plan has accepted the plan," 11 U.S.C. § 1129(a)(10), the Code's "cram down" standards for confirmation apply. Under the cram down rules, the court must confirm the plan if it is "fair and equitable" and "not unfairly discriminatory" to the rejecting class(es). 11 U.S.C. § 1129(b)(1).

■ A plan is fair and equitable with respect to a class of unsecured claims if it complies with the "absolute priority rule," which "bars old equity from receiving any property via a reorganization plan 'on account of' its prior equitable ownership when all senior claim classes are not paid in full."[8] *In re Bonner Mall Partnership (Bonner Mall Partnership v. U.S. Bancorp Mortgage Co.)*, 2 F.3d 899, 908 (9th Cir.1993), *cert. granted*, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), *appeal dismissed as moot*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). The rule originated in judicial construction of the fair and equitable requirement in the prior Bankruptcy Act (the "Act") and gained statutory force when Congress incorporated it in the Code. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169, 176–77 (1988). Under the Act, courts permitted former shareholders to participate in reorganizations if they contributed value that was new, substantial, money or money's worth, necessary to a successful reorganization, and reasonably equivalent to the value of the interest received. *See Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10–11, 84 L.Ed. 110, 122–23 (1939).

Although Congress codified the absolute priority rule in 1978, it did not expressly incorporate the "new value exception" into the Code. Courts have disagreed whether the exception survived enactment of the Code,

and the Supreme Court has not ruled on the question. *See Ahlers*, 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3, 99 L.Ed.2d at 169 n. 3. As noted, the Second Circuit Court of Appeals has now joined those courts that refuse to recognize the new value exception in circumstances similar to those in the instant case.

### VI.

### ANALYSIS OF DEBTOR'S PLAN

■ Because two impaired classes voted to reject the debtor's plan, the debtor seeks to confirm its plan pursuant to the Code's cram down provisions and to allow the equity owners to remain, notwithstanding the absolute priority rule. The debtor specifically asks the court to adopt and apply the new value exception to the absolute priority rule. See Memorandum in Support of the Confirmation of the Debtor's Plan of Reorganization and In Opposition to the Confirmation of the Ocwen Liquidating Plan of Reorganization [Debtor's Memorandum] at 13, 20–31. In light of the *Coltex* ruling rejecting the new value exception under circumstances similar to those at hand, the debtor's request cannot be granted.

### A.

In *Coltex*, a single-asset limited partnership that owned a ten-story office building defaulted on its mortgage and filed a Chapter 11 petition on the eve of a foreclosure. *See* 138 F.3d at 40–41. The mortgagee, BT/SAP, had acquired the loan when it purchased a loan portfolio. *Id.* The bankruptcy court refused to shorten the exclusivity period to permit BT/SAP to submit its own plan, which would have paid non-insider unsecured creditors in full. *Id.* The debtor's plan proposed to pay unsecured claims, including BT/SAP's unsecured deficiency claim,[9] 10% in

---

8. The Code provides that a plan is fair and equitable as to a class of unsecured claims if:

   (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. 11 U.S.C. § 1129(b)(2)(B). Subsection (i) is not relevant to the instant case.

9. BT/SAP's total claim was $7,200,000 and the office building was valued at $2,950,000.

cash. *Id.* at 41–42. In return for contributing approximately $3,400,000, the debtor's partners would retain their interests post-confirmation. *Id.* The debtor had sought equity or other financing from only one lender, which had rejected the request; the debtor had not retained any mortgage brokers or consultants to help locate other sources of financing; and the debtor had not considered bringing in new equity partners as an alternative means of funding the plan. *Id.* The bankruptcy court confirmed the plan over BT/SAP's objections, holding that the partners' contribution satisfied the new value exception to the absolute priority rule. *Id.* The district court reversed and the debtor appealed. *Id.*

Reviewing the applicable principles, the court of appeals observed that a plan is not fair and equitable if unsecured creditors are not paid in full and equityholders retain any property on account of their junior claims. *Id.* at 43. "[T]he *exclusive* right to retain the debtor's property upon making a capital contribution is itself property." *Id.* (emphasis in original). Because the debtor had the exclusive right to contribute new value, under the debtor's plan old equity would receive the real estate "on account of equity's prior position and the rights emanating from that position" and not on account of the new capital contribution. *Id.* at 43.

> In this case, BT/SAP was ready with a plan of its own, which proposed to pay non-insider unsecured creditors in full. It would have left Coltex's Partners with nothing. They, like anyone else, could have attempted to purchase the Property at market price. Instead, under the Plan, the Partners avoid foreclosure by BT/SAP and obtain the Property at a set price untested by market forces, leaving the unsecured creditors with a ten percent recovery. Common sense suggests that the Partners believe that they are getting a bargain by virtue of their previous position, which enables them to avoid both competing reorganization plans and competing bids for the property.

*Id.* at 44–45 (footnote omitted).

The court further stated that even if it were to apply the new value exception, it would reach the same result because the debtor could not meet the exception's "necessary" requirement. *Id.* at 44–46. The court noted that Coltex was simply an entity with title to a parcel of real estate, not a business enterprise with employees who might be displaced or production that might be interrupted. *Id.* at 45–46. "Failure to accept the Plan of the debtor does not mean that the business will fail in the normal sense of that concept. Under the conditions at hand any number of plans may be considered a 'successful reorganization,' not simply one which makes little change in ownership." *Id.* (footnote omitted). The court concluded the plan "was an insider's plan for the benefit of insiders. It was of little benefit to any creditor, and the major creditor was stymied in its legitimate attempts to obtain the value of its claims." *Id.* at 46.

### B.

Under the principles enunciated in *Coltex*, the debtor's plan in the case at hand is clearly not fair and equitable. The facts in the case before the court are similar to, and more compelling than, those in *Coltex*. As in *Coltex*, the debtor is a partnership owning a single parcel of real estate; it is not a business enterprise. Both debtors filed Chapter 11 to forestall foreclosure and both mortgagees acquired their loans when they purchased loan portfolios. The *Coltex* court considered it significant that BT/SAP's plan, which BT/SAP had not been permitted to file, would have paid all unsecured creditors in full, while the debtor's plan would have paid just 10% on BT/SAP's unsecured claim. Ocwen's plan will pay all creditors in full except for Ocwen's own claim, the affiliated debt claims, and the limited partner damage claims. The debtor's plan would pay only 1%—a fraction of the *Coltex* distribution—on Ocwen's unsecured claim.

Like the debtor's plan in *Coltex*, the debtor's plan in the instant case is "an insider's plan for the benefit of insiders" and of little benefit to the major creditors. The new value contribution, earmarked for capital repairs, would go entirely to increase the value of the debtor's property, and not to repay creditors. Besides receiving less than 1% of

their claims on the effective date, the unsecured major creditors would receive none of the excess cash flow forecast in the debtor's plan. Rather, under the debtor's "priority return" provisions, the excess cash flow would go entirely to repay the new value contribution and to provide a return to the investors. *See In re Bryson Properties, XVIII (Travelers Ins. Co. v. Bryson Properties, XVIII),* 961 F.2d 496, 504 (4th Cir.1992), cert. denied, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) (noting that in the debtor's plan, which the court rejected as violating the absolute priority rule, "the equityholders have given themselves not only the exclusive right to contribute, but the right to return of their new capital prior to Travelers' recovery of its unsecured claim."). *See also In re One Times Square Assocs. Ltd. Partnership,* 159 B.R. 695, 708 (Bankr.S.D.N.Y. 1993), aff'd, 165 B.R. 773 (S.D.N.Y.1994), *aff'd,* 41 F.3d 1502 (2d Cir.1994), *cert. denied,* 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995) (holding that the new value exception survived but concluding that the debtor's plan violated the absolute priority rule because the capital infusion would be used primarily to make repairs to the building "and thereby preserve and enhance the value of the interest to be retained by the contributing principals. Thus, the Plan reserves the upside potential for the Debtor while forcing the Bank to bear all the risk ."); *In re Miami Center Assocs., Ltd.,* 144 B.R. 937, 942 (Bankr.S.D.Fla.1992) ("In essence, from the debtor's perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the hotel will increase which inure to the benefit of the debtor's principals (who may 'withdraw' the increased value by selling the property in the future). In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule.")

To address potential concerns as to the absence of competitive bids, at the confirmation hearing the debtor and DDC indicated that another party may make an equity contribution in place of Newco, so long as the plan remained otherwise unchanged. *See Transcript of Confirmation Hearing,* December 11, 1997, at 84–86. The debtor, in its post-trial brief, stressed that it would permit such an investment *"provided that all other terms of the Debtor's Plan remain as is and any party making the equity contribution in place of 'Newco' under the Debtor's Plan be required to comply therewith in all respects." Debtor's Memorandum* at 29 (emphasis in original).

Ocwen contends it is inappropriate for the court to consider this proposal as it is inconsistent with the debtor's plan and disclosure statement. The debtor did not file modifications with the court and provide notice of the modifications to creditors. *See* Fed. R.Bankr.P. 3019.

Assuming that the court may consider the debtor's proposal on the merits, allowing another party to make an equity contribution without changing any other terms of the debtor's plan does not effect compliance with the absolute priority rule. A DDC officer testified that DDC had not solicited any bids for the debtor's equity. *See Transcript of Confirmation Hearing,* December 11, 1997, at 63. The so-called "equity auction" proposed in the debtor's plan with notice to a limited audience does not constitute a true solicitation of bids in an open marketplace but an attempt to avoid Ocwen's plan without putting Prescott Glen up for sale. More to the point, the "auction" is illusory because it would allow the present equity owners to retain ownership of Prescott Glen. Although Ocwen, or any other party making the investment, would receive the benefit of the "priority return" of the reorganized debtor's excess cash flow, Newco would retain its right to designate all post-confirmation partner interests in the reorganized debtor and would, as described in the plan and confirmed in testimony, name itself general partner and designate the current investors as the new limited partners. *See Debtor's Plan* at §§ 7.1, 7.2; *Transcript of Confirmation Hearing,* December 11, 1997, at 86. Since old equity would *not* make the new value contribution but would nonetheless retain an interest in the reorganized debtor, there is no basis for claiming that old equity would retain its in-

terest for any reason other than on account of its prior position. Meanwhile, Ocwen's mortgage would be stripped. Such an arrangement would plainly violate the absolute priority rule.

The court concludes that the debtor's plan is not confirmable because it violates the absolute priority rule and therefore is not fair and equitable. Although Ocwen objects that, *inter alia*, the debtor's plan both artificially creates and impairs certain classes and improperly subtracts the value of cash collateral rents from the value of Ocwen's secured claim, these objections need not be resolved in light of the conclusion that the plan is not fair and equitable.

### VII.

### *ANALYSIS OF OCWEN'S PLAN*

■ The debtor objects to Ocwen's plan on several grounds. First, the debtor asserts that Ocwen has failed to satisfy § 1129(a)(10). Ocwen's is the sole claim in Class One, the only accepting class. According to the debtor, Ocwen's claim is not impaired because the treatment it receives under Ocwen's plan is identical to the treatment it sought when it accelerated and attempted to foreclose on its lien. *Debtor's Memorandum* at 57. This argument is groundless. Ocwen's rights impaired under its plan because the plan would use Ocwen's cash collateral to pay administrative, tax, trade, and employee wage and benefit claims.

■ Next, the debtor contends that Ocwen's vote does not count for purposes of § 1129(a)(10) because Ocwen is an insider,[10] based on Ocwen's alleged exercise of control in determining whether to make capital improvements to Prescott Glen and on the debtor's workout agreement with HUD, which provided for the mortgagee's 15% equity participation in Prescott Glen. *Id.* at 58. These contentions are insubstantial. Ocwen's conditions for use of its cash collateral were negotiated in consensual cash col-

lateral orders entered by the court and the orders themselves state that "nothing contained herein ... shall be deemed to constitute Ocwen as a 'person in control of the debtor' or an 'insider' of the Debtor within the purview of Code § 103(31)." *Debtor's Exh.* 16 *(Preliminary and Final Orders Conditioning Dwellco I Limited Partnership's Use of Rents and Providing Adequate Protection of Ocwen Federal Bank, FSB Interest in Rents)* ¶ 17. Furthermore, the court finds nothing in the HUD workout agreement that makes Ocwen an insider under the circumstances of this case.

■ The court finds that Ocwen's plan complies with all the requirements of § 1129(a) except for § 1129(a)(8). Because Class Five, which is impaired, voted to reject Ocwen's plan, and Classes Six and Seven, which would receive nothing under the plan, are deemed to have rejected it,[11] Ocwen's plan must comply with the Code's cram down provisions. Ocwen's plan is fair and equitable as to the rejecting classes because no class junior to any one of them retains property under the plan. Furthermore, the plan does not discriminate unfairly against any one of these classes.

The court concludes that Ocwen's liquidating plan is confirmable.

### VIII.

### *CONCLUSION*

For the reasons stated above, the court denies confirmation to the debtor's plan and confirms Ocwen's liquidating plan.

It is SO ORDERED.

---

**10.** Satisfaction of § 1129(a)(10) must be "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10).

**11.** 11 U.S.C. § 1126(g) provides that "a class is deemed not to have accepted a plan if such plan

provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."